IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SHEILA SLAUGHTER RICHEY,

  *Plaintiff,*

  v.

  No. 1:24-cv-00134-SB

SHOWTIME NETWORKS INC.,

  *Defendant.*

---

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; John W. Huber, Todd McMurtry, HEMMER WESSELS MCMURTRY PLLC, Fort Mitchell, Kentucky.

*Counsel for Plaintiff.*

Elena C. Norman, Daniel Marc Kirshenbaum, Robert M. Vrana, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware; Adam I. Rich, Elizabeth A. McNamara, DAVIS WRIGHT TREMAINE LLP, New York, New York.

*Counsel for Defendant.*

---

**MEMORANDUM OPINION**

March 18, 2025

---

BIBAS, *Circuit Judge*, sitting by designation.

Normally, a plaintiff who cries unjust enrichment must have actually enriched somebody. Sheila Slaughter Richey alleges that (1) Georgette Jones breached a contract with her, and (2) the breach helped Showtime make a hit TV show. So Sheila sued Showtime for unjust enrichment. But she has not alleged that *she* enriched Showtime. And she does not meet an exception that would let her skirt this requirement. So I dismiss her claim.

## I. SHOWTIME MAKES A HIT SHOW THAT STEMMED FROM A BROKEN CONTRACT

Music stars enjoy many perks that the rest of us do not, but a serene home life is rarely one of them. So it went with country music superstars George Jones and Tammy Wynette. Jones and Wynette had a "tumultuous" marriage that ended in divorce. First Am. Compl. D.I. 5, ¶ 32. They also had a daughter, Georgette. *Id.* ¶ 3. In 2011, Georgette wrote a memoir, *The Three of Us: Growing Up with Tammy and George*, which recounted her parents' marriage and her mother's later marriage to George Richey. *Id.* ¶¶ 17, 32. The memoir made damning allegations against Richey: that he had encouraged Wynette's addiction to painkillers, that he might have staged break-ins at Wynette's house to make her think she needed his protection, that he had physically abused Wynette, and that he had controlled her career. *Id.* ¶¶ 68, 78, 83, 88. In short, the memoir painted him as a "manipulative, abusive, controlling con[ ]artist who exploited [Wynette]." *Id.* ¶ 25. Georgette eventually sold the rights to turn her memoir into a movie, which then became a series. *Id.* ¶ 39. Showtime bought the rights. *See id.* ¶¶ 39–40.

By the time Georgette released her book, Richey had died. *Id.* ¶ 18. But his last wife, Sheila Slaughter Richey, did not take kindly to Georgette's portrayal of her late husband. *Id.* ¶¶ 18–19. So she sued Georgette for making "false accusations … against Richey and his surviving family members, among other things." *Id.* ¶ 19. The parties settled, and as part of the settlement, Georgette signed a non-disparagement agreement in 2019. *Id.* ¶¶ 5, 20; D.I. 5-1 at 2. Under its terms, Georgette promised "not to make any statements … or cause or encourage others to make any statements … that defame, disparage, or in any way criticize … George Richey." D.I. 5-1 at 2.

Meanwhile, the TV series was proceeding—with Georgette's involvement. She spoke to its creators, introduced them to people who knew her parents, was credited as a consulting producer, and was generally "an open book" for the show. First Am. Compl. ¶¶ 42, 47–49. So in April 2022, Sheila's lawyer sent a letter to the series' actors, producers, writers, and showrunner, along with Showtime's parent company, warning them that Georgette had signed a non-disparagement agreement, claiming that her involvement with the show broke that agreement, and threatening to sue. *Id.* ¶¶ 56–59; D.I. 5-2 at 5–6. Unimpressed, Showtime released the show a few months later. First Am. Compl. ¶ 1.

The series was called *George & Tammy*, and it was indeed unflattering to Richey. *Id.* It showed Richey encouraging Wynette's painkiller addiction; implied that he had staged break-ins at her home to gull her into thinking that she needed his protection; showed him physically abusing Wynette and his prior wife, including by punching the prior wife in the face; and hinted that Richey had destroyed Wynette's will so that

he would inherit her estate. *Id.* ¶¶ 69–87, 96–97. These were, to say the least, "statements … that … criticize[d] … George Richey." D.I. 5-1 at 2. And Georgette was involved with the show, causing Sheila to suspect that she had "cause[d] or encourage[d]" these criticisms in violation of the non-disparagement agreement. *Id.*; D.I. 5-2 at 6.

Sheila could have sued Georgette for breaking their agreement. But *George & Tammy* had been a hit, and Showtime had presumably profited handsomely from Georgette's breach. First Am. Compl. ¶¶ 1, 35, 104. So instead of going after Georgette for whatever damages her breach caused, Sheila set out for bigger game. She sued Showtime for unjust enrichment, arguing that by profiting from Georgette's breach, Showtime had been unfairly enriched and must disgorge at least some profits to her. *Id.* ¶ 100; *id.* at 53. Showtime has moved to dismiss. D.I. 15.

I must take the complaint's nonconclusory allegations as true and draw all plausible inferences in Sheila's favor. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). Even so, Delaware law does not support Sheila's claim for unjust enrichment, so I grant the motion.

## II. I APPLY DELAWARE LAW

Before deciding whether Sheila has stated a claim, I would usually need to decide under which state's law she must state one. Several states are plausible: New York (Showtime's principal place of business, where it might have received any unjust profits), Delaware (Showtime's place of incorporation), and Texas (Sheila's home, the place the non-disparagement agreement was signed, and the state whose laws the agreement says apply to any lawsuit enforcing it). First Am. Compl. ¶¶ 11–12; D.I.

5-1 at 2. The states in which Georgette encouraged disparaging statements about Richey might also be relevant, but the complaint does not say what they are. All of this would normally give me pause before assuming that Delaware law applies.

But the parties make this issue easier. If parties do not argue for one state's laws over another's, then Delaware courts often presume that forum law governs. *US Dominion, Inc. v. Fox News Network, LLC*, No. N21C-03-257, 2022 WL 100820, at *3 n.28 (Del. Super Ct. Jan. 10, 2022); *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 315 n.1 (Del. Ch. 2022); *Wunderlich v. B. Riley Fin., Inc.*, No. 2020-0453, 2021 WL 1118006, at *5 n.30, *6 (Del. Ch. Mar. 24, 2021); *Friday v. Smoot*, 211 A.2d 594, 595 (Del. 1965), *overruled in part by Travelers Indem. Co. v. Lake*, 594 A.2d 38 (Del. 1992).

True, before defaulting to Delaware law, Delaware courts sometimes give other jurisdictions' laws a once-over to satisfy themselves that there is no relevant conflict lurking. *Garfield*, 277 A.3d at 315 n.1; *Wunderlich*, 2021 WL 1118006, at *5 n.30. But they do not wade through a full-blown choice-of-law analysis. When the parties have not raised this issue or even hinted at what other states' law says, the wiser course is to follow their lead and apply the law used by their briefing.

Here, the parties have not raised choice of law, have briefed only Delaware law, and have both presumed that Delaware law applies. D.I. 16 at 7–9 (arguing only that plaintiff failed to state a claim under Delaware law); D.I. 18 at 7–8 (using Delaware law to oppose the motion to dismiss). So I "too will apply the law of Delaware." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir.2014).

Because I dismiss without prejudice, the parties might come back with an amended complaint and a new motion to dismiss. If they do, I expect them to consider which state's law applies and to brief its content.

### III. SHEILA HAS NOT STATED A CLAIM FOR UNJUST ENRICHMENT

To plead unjust enrichment, Sheila must plausibly allege that (1) Showtime was enriched, (2) she was impoverished, (3) Showtime's enrichment was related to her impoverishment, and (4) Showtime's conduct was not justified. *Chumash Cap. Invs., LLC v. Grand Mesa Partners, LLC*, No. N23C-07-209, 2024 WL 1554184, at *14 (Del. Super. Ct. Apr. 10, 2024) (citing *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 390–91 (Del. 2023)). Her complaint fails at element (3). To allege a relationship between Showtime's enrichment and Sheila's impoverishment, Sheila would ordinarily need to claim that Showtime was enriched *by her. E.g.*, *Stein v. Wind Energy Holdings, Inc.*, No. N21C-09-060, 2022 WL 17590862, at *9. (Del. Super. Ct. Dec. 13, 2022). She has not done that, so I dismiss her claim.

#### A. Showtime was not enriched by Sheila

The crux of Sheila's claim is that Georgette wronged her by breaching the non-disparagement agreement and Showtime profited from that wrong. But that is not enough for unjust enrichment. Instead, a plaintiff must usually allege that *she* is the one who enriched the defendant. *Id.*; *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59–60 (Del. Ch. 2012); *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, No. 2129, 2007 WL 1498989, at *6 (Del. Ch. May 16, 2007); *CoreTel Am., Inc. v. Oak Point Partners, LLC*, No. N21C-10-103, 2022 WL 2903104, at *11 (Del. Super. Ct. July 21, 2022).

Sheila has not. She does not allege that she paid Showtime any money, rendered it any service, gave it anything of value, or had property rights that Showtime violated. All she did was sue Georgette and get her to sign a non-disparagement agreement. First Am. Compl. ¶¶ 99–100. Those actions might have benefited Sheila, but they did not enrich Showtime. Nor did Sheila own the story that Showtime used. The network's right to turn George and Tammy's story into a TV show came from the First Amendment and from buying the rights to dramatize Georgette's book. *Sarver v. Chartier*, 813 F.3d 891, 905 (9th Cir. 2016); *see* First Am. Compl. ¶¶ 39–40. So Showtime did not exploit Sheila's property rights by making the series.

If anyone enriched Showtime here, it was Georgette. She wrote the book on which the series was based, she transferred the book's rights, and (I must presume at this stage) she violated the non-disparagement agreement by dishing details that made for juicier TV. So maybe Sheila could sue *Georgette* for *breach of contract*. But she cannot sue Showtime for unjust enrichment.

## B. Showtime did not knowingly facilitate any breach by Georgette

Having run smack into the problems above, Sheila tries to squeeze into an exception: The connection between Showtime's enrichment and her impoverishment can be looser if Showtime knowingly facilitated Georgette's breach. *Chumash*, 2024 WL 1554184, at *17; *CoreTel*, 2022 WL 2903104, at *11.

But Sheila does not plausibly allege this. Showtime might have knowingly facilitated a breach at three points: when Georgette sold the rights to her book, when she encouraged *George & Tammy*'s creators to paint Richey in a negative light, and when Showtime released the show. None works.

7

*First* is Georgette selling the rights to her book. The complaint does not allege that Showtime facilitated the sale while knowing that the sale breached a non-disparagement agreement. If anything, it suggests the opposite. It says that Georgette published her book in 2011, that *George & Tammy*'s showrunner started working on the show that same year, and that a movie based on the book (which became the show at the center of this case) was announced in 2016. First Am. Compl. ¶ 39. None of those allegations suggest that Showtime knowingly facilitated the violation of a non-disparagement agreement that did not exist until 2019. D.I. 5-1.

*Second*, Georgette might have breached the agreement by causing or encouraging Showtime to make the show critical of Richey. This breach would have happened while the show was being made—as Georgette was goading its writers to pile on unflattering scenes or coaxing its actors to play Richey more darkly. For its part, Showtime would have facilitated this breach by hiring Georgette and succumbing to her vindictive influence. So to have facilitated the breach *knowingly*, Showtime would have needed to know about the non-disparagement agreement while it was making the show.

Sheila claims that Showtime must have known then, but her own allegations suggest the opposite. She says that Georgette publicly discussed the non-disparagement agreement "following the release of the Series." First Am. Compl. ¶¶ 22–23, 25–26. But statements that Georgette made *after* the series came out could not have given Showtime knowledge while the show was being made. Sheila throws in a conclusory assertion that "[t]he defendant knew of Georgette's Agreement," but I need not accept

this unsupported conclusion. First Am. Compl. ¶ 9; *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009).

*Third*, Sheila sent Showtime a letter in April 2022—eight months before it released the series—warning that the series derived from Georgette breaking a non-disparagement agreement. D.I. 5-2 at 2; First Am. Compl. ¶ 29. And Showtime released the series anyway. That, Sheila contends, means that Showtime enriched itself using a product it knew was tainted by Georgette's breach. D.I. 18 at 21.

But the question is not what Showtime knew when it released the series, it is whether it knowingly facilitated *Georgette*'s breach. Sheila has not plausibly alleged that it did. Her complaint suggests that Georgette breached the agreement *before* Showtime learned about it and released the show. Common sense tells us that someone usually cannot facilitate a breach after it has been completed. So does Delaware law. Sheila cites two cases in which Delaware courts found knowing facilitation. D.I. 18 at 21–23; *Lyons Ins. Agency, Inc. v. Kirtley*, No. N18C-09-040, 2019 WL 1244605, at *3 (Del. Super. Ct. Mar. 18, 2019); *Cantor Fitzgerald, L.P. v. Cantor*, No. 16297, 1998 WL 326686, at *7 (Del. Ch. June 16, 1998). In both, the defendant teamed up with someone to break his legal obligations *while* the defendant knew that his partner's conduct was unlawful. *Lyons*, 2019 WL 1244605, at *3; Compl. ¶¶ 21, 27–28, *Lyons*, No. N18C-09-040 (employer knew that employee was contractually barred from recruiting his old firm's clients or using its confidential information, yet allowed employee to do so); *see Cantor Fitzgerald*, 1998 WL 326686, at *6 (firm "continued [to] develop[] and market[]" new product while it "had reason to believe" that "continued

9

development and marketing" constituted breach of key developers' contracts). By contrast, when someone innocently gets a benefit and only later finds out that it was given wrongfully, Delaware courts have not found unjust enrichment. *Jacobs v. Meghji*, No. 2019-1022, 2020 WL 5951410, at \*14 (Del. Ch. Oct. 8, 2020).

If Georgette did breach the non-disparagement agreement, she could have done so only when she was consulting on the show. This means that if Showtime facilitated her breach, it could have done so only during that time. The complaint alleges that Georgette told Showtime about the non-disparagement agreement shortly before the network released *George & Tammy*. Compl. ¶¶ 56–60. But it does not allege that she brought this to the network's attention while Georgette was working with the show's creators, writers, and actors to poison the series against Richey. Instead, Sheila alleges only that Showtime knowingly released a tainted but finished product. That is an allegation of Showtime's knowledge when it was acting on its own, not when it was facilitating wrongful action by Georgette. So Sheila fails to plead her claim. But because I dismiss without prejudice, I leave the door open for her to allege that Showtime was still making the show when it got her letter.

*Finally*, Sheila tries a more creative way to pin knowledge on Showtime. Employers can sometimes be held vicariously liable for torts that their workers commit within the scope of their employment. D.I. 18 at 15. In those cases, the worker's misconduct—including his mental state—gets attributed to the employer. *See Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1200–01 (Del. 2015). Aiming that principle at this case, Sheila insists that because Georgette knowingly breached the

non-disparagement agreement while working for Showtime, her knowledge gets imputed to the network. D.I. 18 at 15.

This adventurous argument fails for two reasons. For one, this is not a vicarious-liability claim. Sheila is suing Showtime for *its own* unjust enrichment, not Georgette's. So she cannot pick one convenient piece of vicarious liability and slip it into a suit that otherwise argues Showtime is liable directly. If Showtime were vicariously liable for anything, it would be for Georgette's breach of the non-disparagement agreement. But "Delaware … has not extended the doctrine of vicarious liability to breach of contract claims." *B&B Fin. Servs., LLC v. RFGV Festivals, LLC*, No. K18C-11-040, 2019 WL 5849770, at *3 (Del. Super. Ct. Nov. 7, 2019).

What is more, the parties are fighting over whether a defendant knowingly facilitated someone else's misconduct. *Lyons*, 2019 WL 1244605, at *3. So Sheila faces the same problem as she does with pleading Showtime's knowledge. The inquiry into knowing facilitation analyzes two people separately: someone who commits misconduct (here, Georgette) and someone who facilitates it (here, Showtime). If courts could find that the facilitator knew something just because the wrongdoer did, that would collapse the analysis. There would rarely be a distinction between knowingly facilitating wrongdoing and innocently receiving its fruits.

 Unsurprisingly, then, Delaware courts have assumed that knowing facilitation requires knowledge by the facilitator and that this knowledge cannot be imputed from the knowledge of the wrongdoer. *See Lyons*, 2019 WL 1244605, at *3 (employer knowingly facilitated employee's use of confidential information because *employer* knew

that employee was barred from using the information). In other contexts, the U.S. and Delaware Supreme Courts have enforced the same distinction. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998) ("Where … liability rests on actual notice … the knowledge of the wrongdoer himself is not pertinent to the analysis."); *Hecksher*, 115 A.3d at 1191, 1200–01 (husband and wife worked for the same employer, who was vicariously liable for husband's wrongdoing because the *wife* knew about it; if the husband's knowledge of his own misdeeds could be attributed to the employer, the court would not have needed to ask whether his wife knew). So Sheila cannot argue that because Georgette knew she was breaking an agreement, Showtime knew it too.

\* \* \* \* \*

Sheila has not pleaded that Showtime knowingly facilitated Georgette's breach, so she must allege that she herself enriched Showtime. She has not. So I dismiss her claim without prejudice.